UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————x

ADVANCED VIDEO TECHNOLOGIES LLC,

    Plaintiff,

  -against-                                  No. 1:11 Civ. 06604 (CM)

HTC CORPORATION AND HTC AMERICA, INC.,

    Defendant.
——————————————————————x

ADVANCED VIDEO TECHNOLOGIES LLC,

    Plaintiff,

  -against-                                  No. 1:11 Civ. 08908 (CM)

BLACKBERRY, LTD. AND BLACKBERRY
CORPORATION,

    Defendant.
——————————————————————x

ADVANCED VIDEO TECHNOLOGIES LLC,

    Plaintiff,

  -against-                                  No. 1:12 Civ. 00918 (CM)

MOTOROLA MOBILITY LLC,

    Defendant.
——————————————————————x

**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SANCTIONS**

McMahon, J.:

Before the court is a joint motion from all defendants in these now-dismissed actions, seeking sanctions in the form of costs and attorneys' fees under 35 U.S.C. § 285, the court's inherent power, and 28 U.S.C. § 1927, against Plaintiff Advanced Video Technologies (AVT) and its counsel.[1]

Also before the court are individual motions by each of the defendants, asking that Rule 11 sanctions be imposed on AVT and its previous counsel of record, Lerner David (in the HTC and Blackberry Actions) and FisherBroyles (in the Motorola Action), for violating Fed. R. Civ. P. 11(b). The moving defendants have all complied with Rule 11(c)(2).

For the reasons set forth below, fees and costs are assessed against AVT (but not its counsel) under 35 U.S.C. § 285. The motions for impositions against AVT or its counsel on any other ground, including Fed. R. Civ. P. 11, are denied.

## INTRODUCTION

Plaintiff is a patent assertion entity (PAE) (known colloquially as a patent troll).

In recent years, courts have seen a significant increase in patent litigation, which has often been linked to the rise of entities such as Plaintiff.[2] "The PAE business model focuses not on developing or commercializing technologies but on buying and asserting patents against companies that have already begun using them, often after independently developing them without knowledge of the PAE's patent." Brian T. Yeh, Cong. Research Serv., R42668, An Overview of the "Patent Trolls" Debate (2013), at 1 (hereinafter CRS Report). In short, PAEs do not create widgets; they secure ownership of the widget's patent and then use it to extract fees from widget-manufacturers who are – or might be – using the patented technology.

PAEs are key players in the "patent monetization" market,

> in which patent rights are separated from any product that would reflect the rights, and are sold, traded, grouped, regrouped, licensed, or repurposed, all for generating an income stream from the rights themselves. In all such efforts to monetize patent rights, the patent holder's behavior is distinct from the behavior involved in creating products and services based on the innovation covered by the patent.

Sara Jeruss, Robin Feldman, Joshua Walker, *The America Invents Act 500: Effects of Patent Monetization Entities on US Litigation*, 11 DUKE L. & TECH. REV. 357, 368 (2012).

---

[1] Defendants' joint motion for costs and attorneys' fees is directed against all of AVT's counsel, past and present, including Lerner, David, Littenberg, Krumholz & Mentlik, LLP (Lerner David), FisherBroyles LLP, The Lehrer Patent Law Firm LLC, MacCartney, MacCartney, Kerrigan & MacCartney (the latter two of which represented AVT in the Motorola Action before FisherBroyles), and Eckert Seamans Cherin & Mellott, LLC (Eckert Seamans). Eckert Seamans became AVT's counsel in all of these actions in April 2015 and is principally responsible for the defense against these motions.

[2] Suits brought by PAEs have risen from 29 percent of all infringement suits in 2010 to 62 percent of all infringement suits in 2012. *See Patent Assertion and U.S. Innovation*, Executive Office of the President (June 2013), *available at* www.whitehouse.gov/sites/default/files/docs/patent_report.pdf.

2

Although PAEs rarely win the lawsuits they bring,[3] that is because they rarely litigate them to judgment. The threat of costly and disruptive litigation is their strongest tool, and it is a potent threat. CRS Report, at 1. "PAEs often offer to settle for amounts well below litigation costs to make the business decision to settle an obvious one." CRS Report, at 1. This allows PAEs "to extract licensing fees far out of proportion with the technology contributed by the patent." Alan Devlin, *Revisiting the Presumption of Patent Validity*, 37 SW. U. L. REV. 323, 349 (2008).

Exploiting the patent-in-suit in these cases, U.S. Patent No. 5,781,788 (the '788 patent), was AVT's sole reason for being. The only precondition to Plaintiff's fulfilling its singular purpose was its acquisition of title to the '788 patent. Obtaining ownership of the patent was AVT's *sine qua non*, the only thing Plaintiff absolutely had to accomplish in order to fulfill its destiny.

At this simple task it proved an abysmal failure.

The sad, convoluted story of how AVT failed to end up with any ownership interest in the patent it was created to exploit is told in this court's opinion dismissing these actions for lack of subject matter jurisdiction. *Advanced Video Technologies, LLC v. HTC Corp.*, 2015 WL 2166182 (S.D.N.Y. Apr. 28, 2015) (Docket #165, hereinafter Opinion). The reader is presumed to be familiar with that opinion and the history it recounts; those facts will not be repeated here.

However, some additional facts have been brought to the court's attention in connection with the present motions.

It appears that AVT's principals, Nicholas Gross and General Patent Corporation (GPC), which manages AVT's business, were aware, virtually from the moment the company came into existence, that they could not trace AVT's chain of title back to an entity that had clear title to the patent – a corporation known as AVC. GPC's General Counsel, Neil Cohen – who also served as AVT's in house counsel at the time – sent an email to Gross, who just days earlier had assigned his (non-existent) interest in the patent to AVT:

> Nick,
>
> Is there any additional documentation that shows that the AVC/Epogy deal closed and that Epogy actually acquired the patent?
>
> Neil Cohen

Gross responded:

> Hi Neil,
>
> Epogy was a private company, so they solicited the votes of the shareholders; these were tallied and the deal went through.
>
> They did not "record" this event on their records, as they were pretty small. The only documentation would be hundreds of letters "agreeing" to the merger, and then you'd have to know how many shares were involved, etc., etc.

---

[3] According to Professors Allison, Lemley, and Walker, PAEs lose 92 percent of merits judgments. *See* John R. Allison, Mark A. Lemley & Joshua Walker, *Patent Quality and Settlement Among Repeat Patent Litigants*, 99 GEO L.J. 677, 694 (2011).

> Not an easy task.
>
> If I can think of another way to "prove" this, I will, but as AVC does not exist anymore, I'm not sure of the options.
>
> If you have ideas, let me know.
>
> NICK G

(Declaration of Kyle D. Chen in Support of Defendants' Motion for Fees (Chen Decl.), Ex. 3 at AVT0034121.)

Gross actually overstated his knowledge in his email to Cohen; in fact, he has absolutely no idea whether any "letters" consenting to the merger were ever sent to Epogy's or AVC's shareholders. (Chen Decl., Ex. 4, Gross 4/2/15 Depo. Tr., at 302:11-18.) Gross also "d[id]n't have a clue" whether any short-form merger between the two corporations ever took place. (Chen Decl., Ex. 5, Gross 10/22/14 Depo. Tr., at 171:15-19.) Neither he nor Cohen ever took the obvious step of checking with the Secretaries of State in Delaware and California, the states where the two corporations were incorporated, to see whether any such merger had been recorded; had they done so, they would have learned that no such transaction was ever recorded. Gross was told by Homer Chang, the president of Epogy, how the deal between AVC and Epogy was accomplished. He had a representation and warranty from Epogy that it had title to the patent (although Epogy's liability for breach of that warrant was limited to a refund of the purchase price). Gross contented himself with that representation.

Without making any further effort to make sure that it had clear title to the '788 patent, AVT proceeded to record its purported ownership of the patent with the Patent and Trademark Office (PTO). Required to establish how it acquired title, AVT submitted copies of the documents conveying title to the patent from Gross to AVT, and from Epogy to Gross (the Intellectual Property Purchase Agreement). To complete the chain, it submitted a copy of the July 17, 2000 "Purchase Offer Agreement" between AVC and Epogy. This was the agreement that outlined the deal by which title to the patent was *supposed to* pass from AVC to Epogy: Epogy would solicit the purchase of AVC's shares, and when it acquired at least 90% of those shares it would merge AVC into itself by a "short-form" merger. AVT offered this document to the PTO to prove that its predecessor in interest, Epogy, had in fact acquired title to the patent; by offering this piece of evidence it implicitly represented to the PTO that the deal, which never occurred, had in fact occurred. The PTO apparently relied on this document to conclude that AVT had title to the patent. When a reexamination request was submitted to the PTO in 2004, AVT represented itself as the "patent owner," and while the PTO performed some sort of title search, it looked back no further than to the previously recorded assignments filed by Gross and AVT.

Having obtained recordation of its purported ownership of the patent – and without regard to the fact that the recordation did not give it title to the patent – AVT brought a total of eight lawsuits against alleged infringers of the patent it did not own: Pure Digital Technology, Thomson Inc., Audiovox, Casio, and Aiptek, in addition to Blackberry, Motorola, and HTC. Five of those lawsuits followed the form of much "patent troll" litigation;[4] the lawsuits settled quickly, before

---

[4] Because of the astronomical costs associated with patent litigation, and the inevitable uncertainty accompanying such litigation, the overwhelming majority of PAE-instituted litigation settles, although only modestly more often

4

any discovery was taken, with the defendants agreeing to take a license from AVT. As far as this court is aware, the issue of AVT's ownership of the patent-in-suit never came up in any of those lawsuits; the defendants relied on the assertion of ownership pleaded in the complaints and recorded with the PTO.

The ownership issue did not come up early in this lawsuit, either. These cases were consolidated before me in early 2012 and litigated extensively – first claim construction, then what turned out to be a premature motion for summary judgment. It was only at the close of merits discovery (which did not begin until February 2014) that Defendants put the pieces of a very strange puzzle together and figured out that AVT lacked any ownership interest in the '788 patent. Indeed, from the record before me it appears that AVT's lawyers were unaware of the issue until March 2014, when they first obtained a copy of the Gross-Cohen email exchange.

As the date for Gross's deposition drew near, AVT's lawyers apparently realized the significance of the email exchange and tried to claw the document back, arguing that it was privileged and should not have been produced in the first place. That issue was eventually litigated before my colleague Magistrate Judge Ellis (although not before the first session of Gross's deposition was held, with no questions being asked about the issue). Judge Ellis concluded that the email exchange had been wrongfully clawed back and ordered that it be returned to Defendants – along with any other documents that might discuss the same subject. A total of 60 documents bearing on the issue of AVT's ownership (none of which had previously appeared on any privilege list) were thereafter produced.

On November 7, 2014, Defendants sent AVT's counsel a letter conforming to Fed. R. Civ. P. 11(c), with a copy of a motion attached. AVT immediately sought a stay of all litigation, but this court, eager to reach so fundamental an issue, denied that application. Defendants moved to dismiss on December 3, 2014; the court granted the motion on April 28, 2015.

The court's decision and order was not appealed. Instead, AVT did what it could and should have done twelve years earlier: applied in the Delaware Court of Chancery for the appointment of a Receiver for the long-dissolved AVC. Its petition was granted. After conducting an independent review, the Receiver executed an assignment of the '788 patent from AVC to AVT. The Receiver also assigned all of AVC's claims under the patent to AVT.

AVT promptly filed new lawsuits against the defendants, asserting all of the infringement claims that it now owned – but had not owned in 2011 and 2012, when these three actions were commenced.

The motions for sanctions followed as the night the day.

## DISCUSSION

The two sets of motions before me – one seeking imposition of sanctions under Rule 11, the other seeking imposition of sanctions under any or all of 35 U.S.C. § 285, the court's inherent power, or 28 U.S.C. § 1927 – rely on the same course of conduct pursued by AVT and its counsel. I conclude that AVT's conduct is sanctionable under 35 U.S.C. § 285, while AVT's counsel's conduct will not be sanctioned on any basis.

---

than patent litigation instituted by producing companies. *See* John R. Allison et. al., *Patent Quality and Settlement Among Repeat Patent Litigants*, 99 GEO. L.J. 677, 694 (2011).

5

## I. Fees and Costs Under 35 U.S.C. § 285; 28 U.S.C. § 1927, or the Court's Inherent Power

### A. Legal Standards

District courts have authority to impose sanctions under 28 U.S.C. §1927 and their own inherent power. *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991). Section 1927 provides that, "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

However, it is not easy for a litigant to obtain sanctions under either Section 1927 or inherent power. "To impose sanctions under either authority, a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, 'motivated by improper purposes such as harassment or delay.'" *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000) (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999)). As this court has said before, this standard is appropriately high: "Under both grounds for sanctions, bad faith may be inferred 'only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'" *Construtora Norbeto Oderbrecht S.A. v. Gen. Elec. Co., No.*, 2007 WL 3025699, at *13 (S.D.N.Y. Oct. 12, 2007) (quoting *Shafii v. British Airways*, PLC, 83 F.3d 566, 571 (2d Cir. 1996)). "[T]he only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is . . . that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986).

In addition to § 1927 and the court's inherent power, sanctions are authorized in appropriate – which is to say, exceptional – patent cases under 35 U.S.C. § 285, which provides that, "The court in exceptional cases may award reasonable attorney fees to the prevailing party." Unlike § 1927 and the court's inherent power, § 285 does not require a showing of bad faith before sanctions may be imposed. The Supreme Court recently explained:

> an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). Observing the lucidity of the statutory text, the Court noted that, "In 1952, when Congress used the word in § 285 (and today, for that matter), '[e]xceptional' meant 'uncommon,' 'rare,' or 'not ordinary.'" *Id.* (quoting Webster's New International Dictionary 889 (2d ed. 1934)).

6

In deploying the totality-of-the-circumstances test, the Supreme Court directed courts to analyze factors such as "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Lumen View Tech., LLC v. Findthebest.com, Inc.*, 24 F. Supp. 3d 329, 335 (S.D.N.Y. May 30, 2014) (citation and quotation marks omitted). "[I]f a case 'stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated,' it is 'exceptional' under § 285." *Gaymar Indus., Inc. v. Cincinnati Sub-Zero Products, Inc.*, 790 F.3d 1369, 1372 (Fed. Cir. 2015) (citation omitted). Thus, among other grounds, exceptionally weak arguments undoubtedly serve to make a case "exceptional." *See Donut Joe's, Inc. v. Interveston Food Servs.*, 2015 WL 4094212, at *4 (N.D. Ala. July 7, 2015) (noting that "Donut Joe's offered extremely weak arguments to establish that its marks were protectable"); *Cross Commerce Media, Inc. v. Collective, Inc.*, 2014 WL 7323419, at *3 (S.D.N.Y. Dec. 16, 2014) ("CI's position in this litigation has lacked any merit. It never had a protectable mark in the word 'collective,' and indeed never made any real effort to demonstrate otherwise.").

Unlike other types of sanctions, sanctions under § 285 may not be assessed against counsel – only against a party. *Rates Tech. Inc. v. Broadvox Holding Co., LLC*, 56 F. Supp. 3d 515, 526 (S.D.N.Y. 2014) (citing *Phonometrics, Inc. v. ITT Sheraton Corp.*, 64 Fed. Appx. 219, 222 (Fed. Cir. 2003)). As my colleague Judge Scheindlin recently explained, "Generally, "[w]hen a fee-shifting statute that authorizes the courts to award attorneys' fees to prevailing parties does not mention an award against the losing party's attorney [as is the case in section 285], the appropriate inference is that an award against attorneys is not authorized." *Id.* n.97 (alterations in original) (quoting *Healey v. Chelsea Resources, Ltd.*, 947 F.2d 611, 624 (2d Cir. 1991)). But, as with other types of sanctions, costs incurred are recoverable along with attorneys' fees. *Cent. Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 2007 WL 840368, at *12 (S.D.N.Y. Mar. 21, 2007) (awarding costs on top of attorneys' fees under § 285).

In evaluating a motion for sanctions, courts "analyze the conduct of parties and their attorneys separately." *Ransmeier v. Mariani*, 718 F.3d 64, 71 (2d Cir. 2013). This means that AVT cannot be sanctioned based on the conduct of its counsel – only on its own conduct.

### B. AVT is liable for attorneys' fees and costs under § 285, but not for sanctions under § 1927 or the court's inherent powers

AVT genuinely but naively believed it held title to the patent-in-suit. That belief was mistaken. Sincerity of belief does not create a property right (though that was pretty much AVT's argument in opposition to Defendants' motion to dismiss). I have already decided, in granting Defendants' motion to dismiss, that everyone involved in the putative assignments subjectively believed title had transferred to AVT. (*See, e.g.*, Opinion at 6, 13, 15.) AVT, through Cohen and Gross, did not, of course, take the steps it could and should have taken to confirm its belief, and perhaps even consciously avoided taking those steps; but Defendants have offered no evidence suggesting that anyone at AVT knew for a fact that it did not own the patent. I thus decline to find

7

that AVT pressed forward with these lawsuits in bad faith, and refuse to impose "inherent power" or § 1927 sanctions.

Under § 285, however, the matter is different.

Applying the Supreme Court's *Octane Fitness* ruling, this case is exceptional. I have never before had a case on my docket in which the purported owner of the patent-in-suit did not in fact own the patent – that alone makes this case "exceptional," for I have no basis on which to believe that suing on a patent one does not own falls within the bounds of normal litigation behavior.

Additionally, surveying the totality of the circumstances, I find that at least two of the factors the Court suggested district courts consider warrant imposition of fees and costs here: "objective unreasonableness" and "the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 n.6 (2014). And additional circumstances further support sanctions, such as Gross and Cohen's head-in-the-sand approach to recognized title defects and AVT's initiation and maintenance of this and numerous prior suits with no confirmation of its unverified beliefs about title.

The objective unreasonableness of AVT's position is plain, despite its attempt to outline a series of reasonable-sounding steps it took.

First, Plaintiff argues that it was objectively reasonable for AVT to believe that AVC had transferred the patent to Epogy because Epogy's officers and the principals of AVC believed that this had happened. But it was not objectively reasonable for AVT to rely on the belief of people like Benny Woo (who was on both sides of that transaction), because AVT knew perfectly well that the companies with which it was dealing had not followed corporate formalities. Gross admitted to Cohen that Epogy had never recorded the solicitation of shareholder consents to the proposed merger on its books – an omission that he excused because of the company's size. Lacking any proof that the merger had been authorized or had taken place, it was objectively unreasonable for Gross to conclude that anyone's mere "belief" was reason enough to conclude that all steps necessary to transfer the patent had actually been taken. As this court has already observed, believing does not make it so.

Second, Plaintiff argues that it was objectively reasonable for AVT to believe that AVC had transferred the patent to Epogy because Homer Chang, Epogy's president, warranted and represented that fact to Gross. Gross testified that he relied on statements made to him by Chang when he concluded that the merger had been properly authorized and consummated – the lack of formal corporate records notwithstanding. Gross further testified that he was confident of his reliance on Chang because (1) he believed that Chang had checked with Peter Couture, outside counsel to Epogy, and (2) Epogy made a formal warranty and representation of ownership in the Intellectual Property Purchase Agreement it signed in connection with its transaction with Gross.

But it was not objectively reasonable for Gross to rely on Chang. Indeed, it does not lie in AVT's mouth to argue that Chang was someone on whom anyone could rely, because AVT urged this court not to rely on Chang's testimony about the purported merger when the motions to dismiss were being adjudicated. In that context, AVT represented that Chang, an engineer, was "not a lawyer" but an electrical engineer whose testimony about the purported merger "reflected a lack of sophistication." (Plaintiff's Opposition to Defendants' Motion to Dismiss (Docket #106) at 23.)

8

Gross knew full well that Chang was not knowledgeable about corporate matters; Gross himself had to tell Chang that Epogy had allowed the '788 patent to expire in the summer of 2002 and that AVT would have to revive the patent before it would be worth anything at all. Gross insisted at his deposition that Chang's statements could be trusted because he was being advised by Couture, but was then forced to admit that he had no personal knowledge about whether Chang consulted with Couture before asserting that Epogy had solicited letters consenting to the merger from its shareholders.

As for the warranty and representation in the Intellectual Property Purchase Agreement: in ordinary circumstances, it might have been sufficient to create an objective belief in the average purchaser of intellectual property. But these were not ordinary circumstances. Epogy's liability for breach of that warranty was limited to a refund of the sum that Gross paid for the '788 patent – a whopping $1,000, the price dictated by the fact that the patent had been allowed to expire prematurely. The very fact that liability for breach of the warranty was limited to a paltry sum suggests that Gross placed little faith in Chang's representation. Furthermore, as Epogy was dissolving simultaneously with the transfer of its assets to Gross, there would be no viable way for Gross to obtain even that modest recompense.

Furthermore, the reliability of the warranty and representation has to be assessed in light of the Cohen-Gross email exchange. It cannot be forgotten that Gross was well aware of the limitations on both Chang's knowledge and Epogy's corporate records, and that both he and Cohen knew that it would be at best difficult, and arguably impossible, to prove that AVC had transferred title to the patent to Epogy. Yet Gross or Cohen did not bother to review corporate filings in Delaware or California to determine whether the merger had in fact been finalized.

AVT next argues that it was reasonable to believe that it owned the patent because the PTO believed that AVT owned the patent. As evidence, it cites a title search that the PTO conducted in connection with AVT's request for reexamination of the '788 patent in July 2004.

The fact that the PTO treated AVT as the owner of the patent was no doubt occasioned by the fact that AVT identified itself as the owner of the patent when it filed the reexamination application. There is no basis to think that the PTO undertook any searching examination of AVT's assertion of ownership; the "title report" on which AVT relies so heavily appears to be nothing more than a search of PTO's own records, which had been provided to it by AVT. *See* PTO's Manual of Patent Examining Procedure (8th ed., rev. May 2004), at § 320 ("The 'title report' is a form which can be used under certain circumstances by the Assignment Division to report to someone within the Office *the name of the owner of an application or patent as shown by the Assignment Division records* on the date the title report is made." (Emphasis added)). It was objectively unreasonable for AVT to believe that the document it had filed with the PTO the previous year evidenced transfer of the patent from AVC to Epogy, because whatever the PTO might have thought, the Purchase Offer Agreement did nothing of the sort. All it did was evidence AVC's *intention* to transfer the patent to Epogy.

Finally, AVT argues that it was objectively reasonable for it to believe that it held title because the first five people it sued settled without challenging its title. But quick settlements are the norm in PAE litigation, and the fact that some corporations chose to avoid the excessive cost of patent litigation says nothing about the validity of AVT's title. AVT behaved no differently than the holders of home mortgages who lacked the documentation to prove that they actually owned the loans associated with homes on which they sought to foreclose, but who commenced

9

foreclosure actions nonetheless, confident that their opponents would lack the wherewithal to demand firm proof of ownership. AVT was no more privileged to draw conclusions about the validity of its title from these settlements than the holders of subprime mortgages were privileged to draw conclusions about their title from the fact that they obtained foreclosures from mortgagees who were incapable of imagining that the party suing them did not really own their debt.[5]

The bottom line here is that AVT, in the person of Gross and Cohen (representing GPC, a sophisticated patent monetization entity), were fully aware, in May of 2003, that there was a gap in AVT's chain of title to the patent. They were also aware that they could not bridge that gap with evidence demonstrating that AVC had actually consummated the proposed transaction with Epogy, thereby transferring title to the patent to Epogy. Knowing that it could not prove good title rendered any reliance by AVT on the beliefs or the statements of AVC and Epogy *objectively* unreasonable – even if Gross and Cohen actually (i.e., subjectively) believed that AVT had title.

To be perfectly frank, the only conclusion that can reasonably be drawn from everything that happened between May 2003 and November 2014 is that sometimes bluffing is a perfectly reasonable business decision. Bluffing is what AVT did: it bluffed by confidently asserting that it owned the patent, knowing that no one was likely to call its bluff and force it to prove what it knew it could not really prove. That cannot be equated with having an objectively reasonable belief that there was no defect in AVT's title to the '788 patent.

AVT tries to escape liability with its blame-shifting *tua culpa*, asserting that "AVT is the victim of another unrelated party's inadvertent mistake." (Plaintiff's Opposition to Defendants' Motion for Sanctions (Docket #185) at 23.) On the contrary: *AVT* had a duty to investigate its chain of title before initiating this suit. And *AVT* failed to follow up on what turned out to be its well-founded concerns that it would not be able to prove title if ever put to the task. By failing to do that, AVT's assertion of ownership of the '788 patent was objectively unreasonable.

The objective unreasonableness of the steps taken by AVT is underscored by the fact that the arguments propounded by AVT in opposing the motions to dismiss were exceptionally weak, as can be fairly inferred from the Opinion dismissing the cases. In its opposition to the joint sanctions motion, AVT fundamentally misconstrues *Octane Fitness*, 134 S.Ct. 1749, by focusing on the strength of its arguments in favor of its *patent infringement* claims (which have not yet been addressed, let alone decided). But that is not the appropriate frame of reference. Instead, AVT should be addressing the strength of its arguments claiming *patent ownership* – the ground on

---

[5] AVT and its counsel ask that this court not to lose sight of the fact that Defendants are infringers of the '788 patent. But there has been no adjudication that any of the defendants are infringers. At present, the court no more believes AVT's assertion that they are than I believe Defendants' assertion that they are not. The evidence has not come in, and so the scales are evenly balanced. Were I to draw any conclusion from the scholarship cited in footnote 3, *supra*, it would not look so good for AVT; however, I will refrain from drawing the conclusion that these cases fall within the 92% of PAE cases that, after full litigation, turn out to be meritless.

AVT also asks the court to consider Motorola's offer to settle its case, which was made after the Rule 11 letters were sent. I can draw no conclusion about AVT's title from that offer; in fact, the conclusion I can and do draw is that Motorola hoped that it could buy its way out of this litigation cheaply once it cast a cloud on AVT's right to bring the lawsuit in the first place. That might well be a sound business decision, but it says nothing about the reasonableness of AVT's belief that it had good title to the patent. In any event, Fed. R. Evid. 408(a) renders the offer inadmissible as evidence of the validity of either Motorola's motion to dismiss or AVT's theory of title.

10

which these actions were dismissed. And on that score, AVT's proof of title to patent '788 was exactly nil. Its arguments were all about wishes and hopes – not proof.

Finally, considerations of compensation and deterrence favor imposing sanctions on AVT. This case involves a PAE that has but one purpose: prosecuting the patent-in-suit. Without title to that patent, it could not do the *one thing* it was created to do. AVT is correct that losing a patent infringement case without more does not warrant sanctions under § 285, but AVT didn't just lose; it had no right to bring the case in the first place. This sanction will thus serve as a deterrent to other PAEs who might prefer to ignore doubts about their title, warning them to make sure they own the patent before initiating suit. AVT had questions about its title but buried its head in the ground, and failed to conduct a reasonable investigation before initiating lawsuit after lawsuit. I cannot imagine that Congress would not have envisioned such a scenario as "exceptional" under § 285.

In a last ditch attempt to avoid the obvious, AVT cites *TriReme Med., LLC v. AngioScore, Inc.*, 2015 WL 3463500 (N.D. Cal. May 29, 2015). But *TriReme* cannot save AVT. In that case, a doctor purportedly licensed his inventor rights to TriReme, which then filed suit against AngioScore for a correction of patent inventorship. But the doctor had previously entered into a consulting agreement with AngioScore, in which he had assigned his rights in the subject patent to AngioScore. TriReme was not aware of the assignment before the initiation of the suit. The court dismissed the action, finding that TriReme had no standing to prosecute its claim because the doctor had no rights in the patent that he could license to TriReme. But the court declined to award fees under § 285 because it found that "*TriReme's arguments were not frivolous or objectively unreasonable.*" *Id.* at *3 (emphasis added). In other words, the court concluded that TriReme's arguments regarding the import of the consulting agreement – which TriReme itself was not a party to – had some reasonable basis.

AVT and TriReme are not similarly situated. AVT was aware of the possible defect in title from the very beginning. It had doubts that such a deal was ever formally recorded and that there would be any way to prove AVT's chain of title based on the supposed merger. AVT took no steps to confirm whether a merger had taken place – not through the simple expedient of state corporate filing records or through tracking down what Gross believed were hundreds of letters from AVC shareholders agreeing to the merger. This failure is inexcusable. Unlike TriReme, AVT could not claim to have found out belatedly about the existence of doubt concerning its ownership rights.

AVT's conduct makes this case exceptional and merits sanctions. The nature of those sanctions will be discussed below.

### C. AVT's Counsel is Not Liable for Fees and Costs

But first I must address whether AVT's lawyers should also be sanctioned.

Because AVT's counsel are not subject to sanctions under the terms of § 285, I would have to find they acted in bad faith to impose sanctions under either § 1927 or the court's inherent power. But the evidence before this court does not establish that AVT's counsel acted in bad faith in bringing these lawsuits originally or in maintaining them once the belated news of AVT's defective title reached their ears. They may have grasped at straws in opposing Defendants' motion to dismiss, but even a cursory review of the case law illustrates that much more is needed for a finding of bad faith. For instance, in *Dux S.A. v. Megasol Cosmetic GmbH*, 2006 WL 44007

(S.D.N.Y. Jan. 9, 2006), plaintiffs filed a frivolous motion based on "numerous material false statements from many sources," had no colorable arguments for trademark ownership, failed to bring relevant precedent to the court's attention, and made contradictory statements in filings before the court. Judge Owen had little trouble concluding that, "When a motion is brought without legal or factual justification, indeed contrary to facts, many documented, and there being no colorable claim discernable, the bad faith for that motion not only can be inferred, but is obvious, and sanctions are warranted." *Id.* at *4.

There is nothing comparable in the record here. AVT's counsel have represented that they did not possess the Gross-Cohen email until March 2014, and there is no evidence to suggest they were otherwise aware of the defect in title. I was once a practicing lawyer, and if my client came to me and told me he owned a patent, and showed me that the patent was registered to him at the PTO, I doubt very much whether I would have undertaken an extensive title search; lawyers are entitled to rely on their clients in such matters.

Nor can bad faith be imputed to the firms for ultimately losing arguments on a complicated area of Delaware corporate law. The arguments were weak, to be sure, but it would be unreasonable for this court to take the position that finding some arguable basis on which to argue for ownership, rather than abandoning one's client when the client finds itself in dire straits, constitutes bad faith.

Therefore, if sanctions are to be imposed on counsel, it must be under Rule 11.

## II. Sanctions under Rule 11

### A. Legal Standard

"[T]he central purpose of Rule 11 is to deter baseless filings in district court and . . . streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (citations omitted). To carry out this purpose, Rule 11 requires attorneys and unrepresented parties presenting documents in federal court to certify "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information."

Fed. R. Civ. P. 11(b).

Rule 11 is triggered when an attorney or unpresented party "present[s] to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it" that does not comport with the presenter's certifications requirements. Fed. R. Civ. P. 11(b). "In deciding whether the signer of a pleading, motion, or other paper has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1344 (2d Cir. 1991). The objective reasonableness standard applies to both attorneys and parties. *ATSI Commc'ns. Inc., v. Shaar Fund Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009). And because the court applies an objective standard, "the subjective *beliefs* of a person who signed or advocated a document are irrelevant in determining whether the certification requirements of the rule have been violated." 2 Moore's Federal Practice § 11.11[3] at 11–23-24 (3d ed. 2008) (emphasis in original) (footnote omitted). In other words, "A pleading, motion, or paper violates Rule 11 if it is frivolous, legally unreasonable, or factually without foundation, even though not signed in subjective bad faith." *Wechsler v. Hunt Health Sys., Ltd.*, 216 F. Supp. 2d 347, 356 (S.D.N.Y. 2002) (citing Simon *DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 167 (2d Cir.1999)).

When a court decides that a Rule 11 violation has occurred, the court may "impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). Although represented parties cannot be monetarily sanctioned for frivolous legal arguments presented to the court, *see Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 166 (2d Cir. 1999), they may be subject to money sanctions if they are responsible for the presentation of groundless factual assertions, *see* 2 Moore's Federal Practice § 11.23[6][c] at 11–62 (3d ed. 2008).

### B. AVT's counsel are not liable for sanctions under Rule 11

There is no evidence in the record tending to show that any of AVT's lawyers learned about the potential defect in AVT's chain of title until March 2014 – more than a decade after Gross and Cohen discussed the problems with proving title. AVT's counsel at the time this suit was initiated – Lerner David and FisherBroyles – were entitled to rely on the representations of their client and the public documentation they reviewed. AVT's counsel acted reasonably in relying on the PTO's Reexamination Certificate, which listed AVT as the owner of the patent. Absent some reason to question the validity of AVT's title – and there is nothing in the record tending to show that AVT ever raised this issue with its lawyers – the steps actually taken by counsel to confirm ownership were objectively reasonable under the circumstances, for the same reason that this case is truly exceptional: people do not ordinarily pay lawyers to bring lawsuits to enforce patents that they do not own. AVT's counsel thus did not violate Rule 11 at the outset of this suit. *Cf. Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1329 (2d Cir. 1995) ("An attorney is entitled to rely on his or her client's statements as to factual claims when those statements are objectively reasonable.") (quoting *Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1470 (2d Cir.1988), *rev'd in part on other grounds sub nom. Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989)).

Defendants nonetheless urge that Rule 11 sanctions be imposed on the law firms because they opposed the motion to dismiss for lack of subject matter jurisdiction without having a good faith belief in the arguments they propounded or a reasonable basis to continue the litigation once AVT's title had been called into question.

13

This is the argument that makes judges cringe when they receive sanctions motions.

Obviously, this court found AVT's arguments meritless. But simply taking an incorrect legal position does not warrant Rule 11 sanctions. In the past, this court has refused to impose sanctions after finding counsel's arguments "meritless." *See Greges v. City of White Plains*, 200 F. Supp. 2d 302, 310 (S.D.N.Y. 2002). Sanctions are to be imposed "with caution," *MacDraw, Inc. v. CIT Group Equip Fin. Inc.*, 73 F.3d 1253, 1259 (2d Cir.1996), and only when it is "patently clear that a claim has absolutely no chance of success under the existing precedents and where no reasonable argument can be advanced to extend, modify, or reverse the law as it stands," *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985). As noted long ago in *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 455 (S.D.N.Y. 2004), when divining the point at which an argument turns from merely losing to losing and sanctionable, district courts must resolve all doubts in favor of the attorney-signer.

To be sure, some of the arguments advanced on AVT's behalf *were* unreasonable. Any lawyer should know that intending to perform an act does not equate to performing the act, and that believing one has title to an asset does not confer title to the asset. Any lawyer should know that sometimes warranties and representations are erroneous (else there would never be lawsuits for breach of warranty!), and that an erroneous representation cannot make true something that is in fact false.

But the ultimate issue in the case was whether, under Delaware law, Epogy's acquisition of the stock of AVC effected a transfer of the patent to Epogy. Here too, there is some basis for a finding of unreasonableness, for the proposition that the acquisition of a corporation's stock does not invest the new parent with title to the acquired corporation's assets is hornbook law. If that were the extent of the issue I would have to conclude that any lawyer asserting the contrary could be sanctioned under Rule 11, for I cannot think of any good-faith basis to argue that this well-settled rule could be either evaded or overturned. If that were the situation, this case would be on all fours with *de la Fuente v. DCI Telecommunications, Inc.*, 259 F. Supp. 2d 250 (S.D.N.Y. 2003), a case in which Rule 11 sanctions were imposed on counsel.

The arguments of Plaintiff's counsel in *de la Fuente* provide a useful comparison. In that securities fraud case, Defendants moved to dismiss the action as time-barred after a straightforward review of the claims illustrated that most of them plainly occurred outside the statute of limitations. Plaintiff opposed the motion to dismiss, advancing a number of arguments that were foreclosed by governing precedent. For example, Plaintiff argued for equitable tolling despite the fact that the governing precedent "h[eld] specifically that the doctrine of equitable tolling does not apply to the statute of limitations in securities fraud cases." *Id.* at 263. There was no good faith basis on which to think that those precedents could be overturned or distinguished. This court concluded that Plaintiff's counsel had violated Rule 11(b)(2) because there was no plausible basis for Plaintiff to think it would prevail.

But in this case, the argument involved more than the straightforward application of longstanding hornbook law. The corporate dissolutions made the issue much more complicated than it ordinarily would have been; and while AVT's invocation of Section 281 was, in the end, woefully incomplete, the intricacies of Delaware corporate law on what happens to the assets of

14

dissolved corporations are such that I cannot say unequivocally that AVT's lawyers asserted this particular argument without any reasonable belief that it might prevail.[6]

In short, I do not believe it appropriate to impose sanctions on AVT's lawyers under Rule 11.

That being so, there is also no basis to impose Rule 11 sanctions on AVT itself.

Even though I have found this case to be "exceptional" under § 285, and AVT's refusal to examine its title to have been objectively unreasonable, I cannot impose Rule 11 sanctions on a represented party like AVT unless I find a Rule 11(b) violation by counsel. Fed. R. Civ. 11(c)(1) ("If . . . the court determines *that Rule 11(b) has been violated*, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." (Emphasis added)). That is because Rule 11(b)'s certification requirements only apply to "an attorney or unrepresented party" who "present[s] to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it." Fed. R. Civ. P. 11(b). The Rule's certification requirements do not apply to a represented party. To be sure, AVT could have derivative liability for a Rule 11 violation by its attorneys; "a sanction for attorneys' fees may be imposed either on the attorney who signs a paper, or on the party he represents, or on both." *Oliveri v. Thompson,* 803 F.2d 1265, 1274 (2d Cir. 1986); *see also United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO,* 948 F.2d 1338, 1344 (2d Cir. 1991) ("Rule 11 subjects the client—'the represented party'—to sanctions even if he has not signed the offending paper."). But there can be no derivative liability where no primary liability is imposed. For that reason, I sanction AVT only under 35 U.S.C. § 285; I deny the motion to sanction AVT independently under Rule 11.

### III. The Amount of the Sanction

The last question to be answered is what the sanction should be. The moving defendants ask for the sun and the moon (in the form of all attorneys' fees and costs incurred from the outset of this litigation), while AVT insists that Defendants wasted not a dime in these lawsuits because any money they have spent will not have to be spent in the new lawsuits that AVT filed once it obtained title to the patent-in-suit.

---

[6] The proof of the pudding is that I seem to have guessed incorrectly about who owned the patent at the time I wrote the Opinion. In the Opinion, I hypothesized that, at some point after dissolution, ownership of a dissolved corporation's assets might eventually devolve onto its shareholder(s), simply because title would have to end up somewhere. In that connection, I conjectured (in pure dictum) that Epogy, as the sole stockholder of AVC, might well have come into ownership of the patent by the date of the opinion. I also said – wisely – that someone better versed in Delaware corporate law than I would have to figure that out. (Opinion at 23.) It appears that someone wiser *has* figured it out; the Receiver appointed by the Delaware court of Chancery for AVC seems to have concluded that AVC continued to own the '788 patent, despite the passage of 15 years since its dissolution (of course, it has been 12 years since Epogy, its corporate parent, dissolved; it might be difficult for ownership of the assets of a dissolved subsidiary to devolve onto its equally dissolved parent). I can hardly punish counsel for guessing wrong about how this tricky and obscure aspect of Delaware corporate law works if I couldn't figure it out.

Predictably, Defendants have suggested that we will continue to litigate the issue of patent ownership (Reply Br. At 9), but if I were defendants, I would not rest any such endeavor on parenthetical dictum from this court. It will get them exactly nowhere.

15

Both parties are incorrect.

AVT is right that, in its newly filed lawsuits, the claim construction from the dismissed actions can simply become the claim construction in the new actions, and none of the fact and expert discovery taken in the dismissed actions needs to be duplicated in the new actions.[7] But it errs in thinking that that allows it to get off scot-free. The entire litigation over its title – including the proceeding before Magistrate Judge Ellis to compel use of the clawed-back document and production of related documents; the second session of Gross's deposition (which was necessitated by the claw back of the critical e-mail exchange and the failure to produce related documents), and the successful motions to dismiss for lack of subject matter jurisdiction – is unique to these lawsuits and not transferrable to the new cases. And those are costs that would never have been incurred if AVT had not brought suit on a patent it did not own.

The attorneys' fees and associated costs (including the entire cost of retaking Gross's deposition, court reporter fees and all) that were incurred in connection with matters relating to the ownership issue are appropriately imposed on AVT. To quote my colleague, Judge Cote, discussing her reasons for making a PAE bear the costs of an exceptional case under § 285:

> This litigation was resolved on the merits because this defendant has the financial ability to resist the plaintiff's pressure and because it chose to fund a defense in court rather than pay an unwarranted, less expensive licensing fee. It appears that none of the other defendants sued by Lumen made that choice. As a result, but for FTB's financial resources and resolve, Lumen's predatory behavior would likely have proceeded unchecked. Any award in this action must be substantial enough to deter Lumen from pursuing baseless claims in the manner Lumen used in this case.

*Lumen View Tech., LLC v. Findthebest.com, Inc.*, 63 F. Supp. 3d 321, 327 (S.D.N.Y. 2014). If the Defendants here would have simply capitulated to AVT's demands, as the settling defendants did in AVT's prior lawsuits, AVT would likely have continued prosecuting lawsuits to obtain licenses of a patent it did not own – predatory behavior by any standard. And because ". . . the primary goal of Section 285 is to compensate parties who have been forced to defend against frivolous and unwarranted suits," *id.* at 326, imposing these costs on AVT is necessary to compensate the moving defendants for a needless waste of time and resources.

Defendants are also entitled to recover the attorneys' fees incurred in making the 35 U.S.C. § 285 joint motion, on which they succeeded. They are not, however, entitled to recover the cost of the Rule 11 motion, or as much of the joint motion as argued under 28 U.S.C. § 1927 and inherent power (which I view as a negligible part of the § 285 motion).

## CONCLUSION

Because I find that this case is exceptional under § 285, I grant Defendants' joint motion for fees and costs against AVT on that sole ground (Docket #169) and otherwise deny that motion. I also deny the three separate Rule 11 motions (Docket ##167 (HTC), 114 (Blackberry), and 131 (Motorola)).

---

[7] In fact, there seems to me to be no reason why we cannot go immediately to summary judgment motions on the merits or to trial.

Per Defendants' request, Defendants have 30 days from the date of this order to submit documentation detailing the costs and fees incurred in briefing related to the matters as to which the court has authorized sanctions.

The Clerk of the Court is directed to remove Docket Nos. 167 and 169 in 11-cv-06604, Docket Nos. 114 and 115 in 11-cv-08908, and Docket Nos. 129 and 131 in 12-cv-00918 from the Court's list of pending motions.

Dated: August 28, 2015

_____
U.S.D.J.

BY ECF TO ALL COUNSEL